T.C. Summary Opinion 2004-163

UNITED STATES TAX COURT

MARIA NERIS ZELAYA, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16148-03S.          Filed December 1, 2004.

Maria Neris Zelaya, pro se.

<u>Marty J. Dama</u>, for respondent.

WOLFE, <u>Special Trial Judge</u>:  This case was heard pursuant to
the provisions of sections 6330(d) and 7463 of the Internal
Revenue Code in effect when the petition was filed.  Unless
otherwise indicated, all subsequent section references are to the
Internal Revenue Code in effect at relevant times.  The decision
to be entered is not reviewable by any other court, and this
opinion should not be cited as authority.

Some of the facts have been stipulated, and they are so found. The stipulation of facts and the attached exhibits are incorporated by this reference. When she filed her petition, petitioner resided in Plano, Texas.

## Background

Petitioner filed a Federal income tax return for taxable year 1998 on September 21, 2001. The return showed an overpayment of $3,810, and petitioner requested a refund of that amount. On or about October 22, 2001, respondent mailed to petitioner a refund check for $3,810 dated October 19, 2001 (refund check).

When petitioner had not received her refund as promptly as she anticipated, she contacted respondent to inquire about the status of the refund. Upon learning that a refund check had been mailed several weeks earlier, petitioner filed a lost or stolen check claim and requested that a replacement check be issued.

On or about February 22, 2002, petitioner's apartment manager notified her that mail was being held for her. It was her refund check.[1] Petitioner called respondent and reported that she had located her 1998 refund check. According to

---

[1] At trial, petitioner testified that the refund check was mailed to her correct street address but was delivered to her apartment manager because the mailing address did not include her apartment number. It is unclear why the apartment manager waited nearly 4 months to notify petitioner that she had mail waiting for her.

petitioner, respondent told her that she could cash the refund check, which she promptly did on February 26, 2002, at a Bank One branch where petitioner had an account.

On or about March 11, 2002, respondent mailed to petitioner a replacement refund check for $3,810 for 1998 (replacement check). Shortly thereafter, respondent notified petitioner that she owed $3,810 plus interest because she had cashed both the refund check and the replacement check. Petitioner denied that she had cashed the replacement check and informed respondent that she had moved to a new address in Plano, Texas, around February 28, 2002, and never received a second check for 1998.

An investigation was conducted by the Taxpayer Advocate Service (TAS). The TAS recovered a copy of both the refund check and the replacement check, which was cashed on March 29, 2002, at the Mineola Community Bank in Mineola, Texas. Petitioner compared the endorsement signatures from the refund check and the replacement check and told investigators that the signature on the replacement check was not hers.

Petitioner is not fluent in English, and she is illiterate. At trial, she was assisted by an interpreter. Because she does not read or write, petitioner signs her name by imitating the characters.[2] On the refund check, petitioner signed her name by

---

[2] As petitioner's trial interpreter stated: "* * * she does not know how to write. So she just has memorized the letters of
(continued...)

printing her middle and last names (Neris Zelaya). The print is in block capital letters, except that the "I" in "Neris" is printed in lower case and dotted. The "N" in "Neris" is signed backwards, as it would appear to a reader seeing its reflection in a mirror. There is no discernable space between the words "Neris" and "Zelaya". At trial, petitioner testified that she always signs her name in the manner described above.

By comparison, the endorsement signature on the replacement check consisted of petitioner's full name of "Maria Neris Zelaya," printed completely in nondescriptive block capital letters. The "N" in "Neris" was not printed backwards, and there are clear spaces between the first, middle, and last names.

In a letter to petitioner in July 2003, the TAS concluded that she endorsed and cashed both the refund check and the replacement check. The letter from the TAS was not part of the administrative record in this case, but its conclusions are described in the record. The extent of the TAS investigation beyond a comparison of the endorsement signatures is unknown.

On or about April 15, 2002, respondent withheld a $1,462 refund that petitioner claimed on her 2001 return to offset in part her 1998 liability. On or about March 3, 2003, respondent withheld a $2,495.56 refund that petitioner claimed on her 2002

---

[2](...continued)
her name and she cannot write anything else".

return. Because respondent withheld petitioner's 2001 and 2002 refunds, petitioner's 1998 tax liability from the duplicate refund checks plus interest was reflected in respondent's records as paid in full.

On January 30, 2003, petitioner received a Final Notice--Notice of Intent to Levy and Your Notice of a Right to a Hearing. Petitioner timely filed a Form 12153, Request for a Collection Due Process Hearing.

On August 13, 2003, petitioner and her interpreter met with an officer from respondent's Appeals Office (section 6330 officer). On August 20, 2003, respondent issued to petitioner a Notice of Determination Concerning Collection Actions(s) Under Section 6320 and/or 6330. Respondent determined that the proposed collection action was appropriate but unnecessary since petitioner's 1998 tax liability had already been paid in full through offsets against her refunds for the taxable years 2001 and 2002. In reaching this determination, respondent's section 6330 officer wrote, in pertinent part:

> The Taxpayer Advocates Office investigated and made a determination after seeing both signatures that Ms. Zelaya cash[ed] both sets of checks. They closed their investigation in July 2003.

> I looked at the signatures and they are similar. Ms. Zelaya prints her name in capital letters. Both sets of checks have printed signatures in capital letters. Ms. Zelaya stated she does not ever print her first name Maria. The second set of checks had Maria printed. The 12153 had Maria printed on it.

It is my opinion Ms. Zelaya cashed both sets of checks.

Advised Ms. Zelaya since refunds for 2001 and 2002 were offset she had the right to file 843 claims for refunds. Gave her the forms and instructions.

Petitioner filed a timely petition for judicial review of respondent's section 6330 determination on September 22, 2003.

## Discussion

Section 6330 entitles a taxpayer to notice and an opportunity for a hearing before certain lien and levy actions are taken by the Commissioner in the process of collecting unpaid Federal taxes. Upon request, a taxpayer is entitled to a "fair hearing" conducted by an impartial officer from the Office of Appeals. Sec. 6330(b)(1), (3). At the hearing, a taxpayer may challenge the existence or amount of the underlying tax liability only if he or she has not received a statutory notice of deficiency for the year in issue or otherwise had an opportunity to dispute the underlying tax liability. Sec. 6330(c)(2)(B).

A taxpayer may appeal the Commissioner's administrative determination from a section 6330 hearing to this Court, and we have jurisdiction with respect to such an appeal so long as we have jurisdiction over the underlying tax liability. Sec. 6330(d). If the underlying tax liability is properly at issue, we review that issue de novo. Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 181 (2000). If the validity of the underlying tax liability is not at issue,

we review the determination for abuse of discretion. <u>Sego v. Commissioner</u>, <u>supra</u> at 610.

In the present case, we have jurisdiction over petitioner's appeal because the underlying tax liability relates to Federal income taxes. See sec. 6330(d)(1); <u>Landry v. Commissioner</u>, 116 T.C. 60, 62 (2001). The underlying tax liability is properly at issue because petitioner did not receive a statutory notice of deficiency and did not otherwise have an opportunity to challenge the underlying tax liability prior to her section 6330 hearing. Accordingly, we review petitioner's underlying tax liability on a de novo basis.

The sole issue is whether petitioner cashed the replacement refund check issued by respondent for the taxable year 1998. Respondent's determination was based on the conclusion that the endorsement signatures on both the refund check and the replacement check were made by petitioner. As described herein, the endorsement signatures were not identical. We think the simple and nondistinctive characteristics of block capital lettering impair any meaningful comparison of the endorsement signatures. We are not convinced by the view of the section 6330 officer that the signatures appear "similar" or the conclusion of a TAS investigation that was not part of the record. Moreover, as described herein, there are clear and discernible differences

in petitioner's signature on the refund check and the replacement check's endorsement signature.

There is no evidence that the section 6330 officer or the TAS investigation adequately considered the issue of whether petitioner cashed the replacement check aside from comparing the simple and nondistinctive endorsement signatures from the checks. Petitioner testified that she relocated prior to the issuance of the replacement check and that the Mineola Community Bank would not have cashed a U.S. Treasury check for her because she does not have any type of relationship with that bank.  The section 6330 officer failed to investigate or consider these relevant matters.[3]

At trial, petitioner's tax preparer, Idayari Pena (Ms. Pena), testified that she had inquired about the practices of the Mineola Community Bank, and ascertained that the bank policy is that its personnel will not cash any check, including a U.S. Treasury check, for anyone who does not have an account there. She also learned that bank records indicate that petitioner never had an account or relationship with that bank.  We found Ms. Pena's testimony to be reasonable and uncontradicted.

---

[3] When asked at trial whether he had made a determination that petitioner signed and cashed both the refund check and the replacement check, the sec. 6330 officer testified: "Yes, the taxpayer advocate office had made a ruling on it.  They're the ones that had sent me copies of this and I showed them to the petitioner.  To me, they looked to be the same signature".

Petitioner's account of the situation is plausible, and her testimony was reasonable. Petitioner notified respondent when she did not received her refund check; she notified respondent again when her apartment manager had located the check; and she sought respondent's permission to cash it. Petitioner was not expecting to receive a replacement check and did not provide respondent with her updated address when she moved. It took petitioner's apartment manager nearly 4 months to notify her that her refund check had arrived, and it is reasonable to believe that the replacement check might not have reached her once she moved out of the apartment complex. At trial, respondent continued to rely solely upon the conclusion that two very simple printed signatures were both made by petitioner. As previously explained, petitioner provided more detailed and more persuasive evidence concerning the circumstances in question. Accordingly, we hold that petitioner did not cash the replacement check. Thus there is an overpayment of $3,810 due petitioner for the taxable year 1998.

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect the foregoing,

<u>Decision will be entered for petitioner</u>.